[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for breach of contract and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") brought by the plaintiff, Peglar Associates, Inc. ("Peglar"), against Professional Indemnity Underwriters Corporation ("PIU"), Montgomery and Collins, Inc. ("MC") and Montgomery and Collins, Inc. of Texas ("MC Texas"). The defendant, PIU, has also filed counterclaims against the plaintiff.
 Findings of Fact
The court makes the following findings of fact by a preponderance of the evidence. Plaintiff Peglar is a corporation located in Stamford, Connecticut that is in the primary business of reinsurance brokerage and related services.
Defendant, PIU, a Texas corporation, was in the primary business of acting as Managing General Agent ("MGA"), and an underwriter for insurance carriers. As MGA, PIU had the ability to underwrite risk and issue policies for insurance carriers. PIU is an active corporation. Since May 9, 1996, however, PIU has not engaged in any business activities except to collect payments from MC incident to the sale of its assets to MC Texas.
Defendant, MC, was in the primary business of acting as agency of CT Page 7734 record or broker, MGA, and/or underwriter, for insurance carriers.
Defendant, MC Texas, was in the same business as MC, and was a wholly owned subsidiary of MC.
I. The 1991 and 1994 Agreements.
On September 24, 1991, Peglar and PIU entered into an agreement entitled "Finders Fee Contract" (hereinafter "1991 Agreement"), whereby Peglar agreed to assist PIU in identifying an insurance carrier or carriers which would enter into an agreement with PIU under which PIU would act as MGA or underwriter for an Errors and Omissions ("EO") Program of insurance.
The 1991 Agreement further provided that once Peglar located a carrier willing to place the EO Program of insurance, Peglar would be entitled to receive "a finders' fee in an amount equal to ten percent (10%) of the gross net commission income, received by PIU, on the business described herein, on policies produced by PIU."
Through George Baumann's efforts on behalf of Peglar, Prudential was identified as an insurance carrier which then entered into an agreement with PIU to place an EO Program of insurance on October 1, 1992.
Peglar was due the finders' fees on EO business for a five (5) year period, commencing with the execution of any agreement between PIU and the carrier located by Peglar.
The 1991 Agreement further provided that if the EO business produced was placed with another carrier at any time during the five year period, PIU would nevertheless be required to remit to Peglar the finders' fees on that business, as long as the identified carrier had not cancelled, and was still willing to write the business.
The 1991 Agreement also provided for an offset of fees due Peglar by PIU of any fees paid Peglar by the identified carrier, Prudential.
The 1991 Agreement did not contain any successor language and it was silent as to what was to happen in the event PIU was sold.
On or about December 15, 1994, PIU and Peglar entered into another Finders' Fee Agreement ("1994 Agreement").
Pursuant to this 1994 Agreement, Peglar again agreed to assist PIU in identifying a carrier or carriers to enter into an agreement with Pm, for the purpose of PIU becoming MGA or underwriter to place a Habitational CT Page 7735 Program of insurance. The finders' fees on the 1994 Agreement were to be calculated in the same way as the finders' fees incident to the 1991 Agreement. However, unlike the 1991 Agreement, there was no expiration of Peglar's entitlement to finders' fees on the Habitational policies. Peglar specifically advised PIU it would not agree to such expiration for business reasons relating to its experience with the 1991 Agreement, and its concerns over the then marketability of the Habitational program.
Further unlike the 1991 Agreement, the 1994 Agreement did not provide for any offset of the fees due Peglar by fees paid to Peglar by the identified carrier.
The 1994 Agreement also did not contain any successor language. It was silent as to what was to happen in the event PIU was sold.
Baumann, on behalf of Peglar, signed the Agreements and performed substantially all of his obligations under the 1991 and 1994 Agreements from his office in Connecticut. PIU signed the Agreements in Texas.
While Baumann traveled to Texas once or twice to negotiate the 1991 Agreement, the bulk of Baumann's performance occurred outside of Texas, in Connecticut, with several visits by all parties to New York and New Jersey.
Throughout its performance on the Agreements, Peglar never had any contact with insureds or potential insureds. Peglar did not create underwriting guidelines and did not sell policies of insurance. The payments, made by PIU to Peglar were accompanied by notices which categorized all such payments as "consultant fees" or "finder's fees".
II. The Asset Sale of PIU.
In May of 1996, PIU sold substantially all of its assets, property and business to MC Texas, in an arms length transaction. The assets sold included all property used in the operation of the business, all governmental approvals, all customer lists, all client records, all accounts, all leases of equipment and all software and computer equipment. According to Sandy Elsas, the President of MC, the majority of the PIU assets were the customer lists and the revenue stream from contracts that PIU had.
The Asset Purchase Agreement provided in relevant part:
(b) Except to the extent expressly assumed pursuant to Section 1.2(a) above, the Buyer does not assume and shall not be liable for any debt, obligation CT Page 7736 responsibility of liability of PIU or the Sellers or any claim against any of the foregoing, whether known or unknown, contingent or absolute or otherwise and whether or not shown or reflected on the Base Balance Sheet or a schedule hereto. Without limiting the foregoing sentence, the Buyer shall have no responsibility with respect to the following, all of which shall be excluded from the Assumed Liabilities:
 (ii) liabilities and obligation arising before or after the date of Closing with respect to any consulting or employment arrangements or agreements set forth on Schedule 2.13.
Schedule 2.13 specifically identifies the Peglar Agreements as two of the agreements not being assumed by the buyer.
While the Asset Purchase Agreement lists MC Texas as the purchasing entity, many aspects of the sale of PIU assets to MC Texas were conducted by principals and employees of the parent company, MC, Inc., out of the home office in Boston, Massachusetts. The closing did not take place in Texas. All revenue reports, customer lists, books and records were generated from and maintained in the Boston home office. The payments for the sale came directly from the parent company.
After the sale, MC Texas took over the PIU lease and moved into the offices of PIU. It also employed PIU employees. The two sole stockholders of PIU, R. Michael Hick and Gene Ladd, were employed pursuant to a one year contract to assist with the transition. Hick and Ladd did not become officers, directors or shareholders of MC Texas.
While PIU was not dissolved, its only function after May 9, 1996, was to collect the payments from the asset sale. PIU stopped producing policies on May 9, 1996.
At the time of the purchase of PIU, MC Texas was an existing business that acted as a managing general agent and as a wholesaler. Prior to the purchase of PIU, MC Texas was already involved in producing EO and Habitational insurance policies. The purchase of PIU's business was an expansion of M and C Texas' existing business.
MC received the retained commissions after the purchase of PIU and PIU continued to be paid by MC a percentage of the revenues generated by the PIU business sold to MC Texas. Specifically, after the initial down payment of $200,000, Hick and Ladd continued to receive 22% of the retained commissions from the transferred business. MC Texas later sold CT Page 7737 substantially all its assets to Crump Insurance. As part of that sale, PIU voluntarily negotiated a buy-out of the Asset Purchase Agreement with MC Texas.
PIU paid finders' fees to Peglar through the sale of its assets to MC Texas in May of 1996. PIU refused to pay Peglar finders' fees for any business generated after that date. MC and MC Texas have likewise refused to pay any finders' fees to Peglar.
 Discussion of Law I. Choice of Law.
In determining what law to apply on the questions of breach of contract and successor liability, the court must look to Connecticut's own conflict of laws rules. Gibson v. Fullin, 172 Conn. 407, 411 (1977).
Connecticut has adopted the "most significant relationship" approach of the Restatement of Conflict of Laws (Second) for determining what law applies to a contract claim. Reichhold Chemicals, Inc. v. HartfordAccident and Indemnity Co., 243 Conn. 401, 413-14 (1977). The Connecticut Supreme Court has adopted the general presumption that "unless another state has an overriding policy-based interest in the application of its law, the law of the state in which the bulk of the contracting transactions took place should be applied." Reichhold Chemicals,243 Conn. at 414.
Specifically, Section 188 of the Restatement provides that the rights and duties in a contract are determined by the law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties. The factors used to determine the state with the "most significant relationship" to the transaction include: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Id. These factors are to be evaluated according to their relative importance with respect to the particular issue, and if the place of negotiating the contract and the place of performance are the same, the local law of that state will usually be applied. Id.
In addition, Section 6 of the Restatement (Second) sets forth seven other considerations in determining which state has the most significant relationship: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the CT Page 7738 determination of the particular issue; (d) the justified expectations of the parties; (e) the basic policies underlying the particular field of law; (f) the certainty, predictability and uniformity of result; and (g) the ease in the determination and application of the law to be applied.Id.
The court finds that the proper analysis of what law to apply begins with the 1991 and 1994 Agreements which are the basis for the breach of contract claims in this case.[1] These Agreements do not have a choice of law provision. However, the bulk of negotiations and substantially all of Peglar's performance took place by Mr. Baumann, at his fax, phone, and computer in his office in Connecticut. He also executed the Agreements in Connecticut. On the other hand, PELT executed the Agreements in Texas. All monies were paid to Peglar, a Connecticut company, by mail to Connecticut. Mr. Ladd came to Connecticut on one occasion to see Mr. Baumann and Mr. Baumann went to Texas several times.
Defendants argue that with respect to the Habitational program, policies could only be issued in Texas, and therefore the Court should favor Texas law. This argument does not withstand scrutiny. The 1991 and 1994 Agreements were not insurance policies involving an insurer and insured. Instead, they were finders' fee agreements. Indeed, Mr. Baumann had nothing to do with the issuance of policies or dealing with insureds. Accordingly, it is the relationship between Peglar and PIU under the Agreements which should be controlling in this analysis, and not Pm's performance of its agreement with Prudential and the ultimate insureds.
Analysis of the factors set forth in Section 188 lean slightly towards Connecticut as the State with the most significant relationship to the transactions contained in the 1991 and 1994 Agreements.
With regard to the remaining factors set forth in Section 6 of the Restatement, and given that the 1991 and 1994 Agreements were not insurance policies but instead involved a finders' fee, the court does not find that any of the factors point to Texas as the correct choice of law to apply. The factors of uniformity and ease in determination and application of the law to be applied clearly point to Connecticut law given this is a Connecticut court. In sum, based on an analysis of all the factors set forth in the Restatement, the court finds that Connecticut law should apply in determining the breach of contract claims under the 1991 and 1994 Agreements.
III. The meaning of the 1991 and 1994 Agreements.
The definitive language that must be reviewed to determine whether CT Page 7739 there was a breach of contract is contained in paragraph one of the Agreements. Specifically, it provides in relevant part: ". . . . PIU agrees to pay to Peglar a finders fee in an amount equal to ten percent (10.0%) of the gross net commission income, received by pm, on the business described herein, on policies produced by PIU."
The words of the contract must be given "their natural and ordinary meaning.". Kelly v. Figueiredo, 223 Conn. 31, 35 (1992); Levine v.Massey, 232 Conn. 272, 278 (1995) (A contract is unambiguous when its language is clear and conveys a definite and precise intent. "The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity"); Tallmadge Bros., Inc. v. Iroquois GasTransmission System, L.P., 252 Conn. 479, 494-97 (2000) (A presumption that the language used is definitive arises when, as in the present case, the contract at issue is between sophisticated parties and is commercial in nature); see also Legget Street Ltd. Partnership v. BeaconIndustries, Inc., 239 Conn. 284 (1996) (". . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract."); c.f., McKeev. Board of Educ., 32 Conn. App. 6 (1993) (Where the agreement provision was "clear and unambiguous, as such, `the contract is to be given effect according to its terms . . . [N]o room exists for construction.' (Citation omitted))".
The common, natural and ordinary meaning of this language in the context of the whole agreement is that Peglar would be paid a finder's fee on insurance policies produced by PIU when PIU received gross net commission income on the EO business under the 1991 Agreement and the Habitational business under the 1994 Agreement. Specifically, PIU was obligated to pay a finders fee often percent of the commission "received by PIU", "on the business described herein" (the EO and Habitational business), "on policies produced by PIU."
Both Mr. Ladd and Mr. Baumann agreed that "policies produced" means the individual insurance contracts that were sold by PIU.[2] Accordingly, both parties to the contract understood the meaning of this term in the context of these Agreements. The court does not need to look beyond the parties understanding to determine if there might be a different meaning in the industry.
PIU stopped producing policies on or about May 9, 1996 when it sold its assets to MC Texas. One of the conditions of payment of the finders' fee is that the policies be produced by PIU. Accordingly, based on the language of the Agreements and the fact that neither Agreement contained any successor obligation language, Peglar was only entitled to finders fees on policies that were entered into before May 9, 1996 by PIU.[3]
CT Page 7740
With respect to the 1991 Agreement, all finders' fees were paid except that PIU refused to pay Peglar finders' fees on the EO book of business transferred by PIU to CIGNA even though Prudential had not cancelled the EO Program. The court finds that paragraph four of this agreement makes clear that Peglar was owed a finders fee on this business through May 9, 1996. Based on the evidence presented, the court finds that PIU owed Peglar $10,000.00 for this period of time. This amount was more than offset, however, by $66,572.00 which Peglar received from Prudential and which should have been given to PIU as a credit pursuant to the express terms of the Agreement. With regard to the 1994 Agreement, Peglar was paid all fees due to it through May 9, 1996. Accordingly, Peglar has not sustained its burden of proof on Count One;
IV. De Facto Successorship.
The court's finding that Peglar was only entitled to fees on policies produced by PIU and that PIU stopped producing policies on May 9, 1996 strongly suggests that no consideration of successor liability is necessary since the Agreements by their own terms make clear that if PIU itself was not producing the policies then there can be no liability to Peglar. In other words, the express language of the Agreements limits liability to PIU only and the court finds that plaintiff has not sustained its burden of proof that defendant PIU breached the 1991 or 1994 Agreements. However, the court also finds that there is no de facto successor liability under Connecticut law.[4]
Under Connecticut law, a corporation which purchases the assets of another company does not automatically become liable for the debts and liabilities of its predecessor unless there exists one of four established exceptions to this general rule. Specifically, the party seeking to impose liability on the basis of de facto successorship must establish: (1) that the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. See Ricciardello v. JW Gant Co., 717 F. Sup. 56, 57 (D. Conn. 1989); Cargill, Inc. v. Beaver Coal Oil, Inc., 424 Mass. 356,676 N.E.2d 815 (1997). Another recognized exception in Connecticut to the general rule is the "product line" exception, which is generally applied to assess liability where the successor corporation may hold itself out as being the same name or product, operation and sale, thereby receiving the benefit of past goodwill, it should likewise bear the burden of past operation. Kennedy v. OshKosh Truck Corp., Superior Court, Judicial district of Hartford, Docket No. 920510394S, (January 20, 1995, Schimelman, J.); Pastorick v. Lyn-Lad Truck Racks, Inc., Superior Court, CT Page 7741 judicial district of Hartford, Docket No. 960562426S (August 3, 1999, Sullivan, J.).
Where a successor corporation is a "mere continuation" of the predecessor corporation, the "mere continuation" exception to the general rule "in effect takes cognizance of what may be called de facto merger", the requirements for de facto merger being: (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation. Sullivan v. A.W. Flint Co., Superior Court, judicial district of New Haven, Docket No. 920339263 (August 5, 1996, Corradino, J.). Not every one of these indicia must be established, however, but the court should apply more of a balancing test. See Cargill, supra, 424 Mass. at 360, 676 N.E.2d at 818 (no single factor is necessary or sufficient to establish a de facto merger);National Gypsum Co. v. Continental Brands Corp., 895 F. Sup. 328
(D.Mass. 1995) ("These factors are mere indicia . . . none of them is essential to a finding of liability").
MC Texas was not a mere continuation of PIU. MC Texas was already an established name in the same business as PIU before it purchased PIU. This arms length transaction constituted an expansion of its already existing EO and Habitational business. The two former shareholders of PIU were only employed by MC Texas for a one year period to help with the transition. The MC Texas business continued to be run after the purchase of PIU by the President of MC Texas. No credible evidence was produced that the PIU name continued to be used in business dealings with the insurance carriers or insurance agents after the sale on May 9, 1996.
PIU ceased engaging in any business activities except to accept payments due under the sale. Ladd and Hick did not become shareholders of MC Texas. Additionally, the purchase Agreement did not provide for successor liability, there was not a merger of the two corporations and there was no evidence presented that the transaction was entered into fraudulently for the purpose of escaping liability.
For all these reasons, the court finds that there was no de facto successorship and no breach of contract by any of the defendants. Accordingly, judgment shall enter for the defendants on all counts of the Plaintiff's Complaint.[5]
CT Page 7742
 COUNTERCLAIMS
The defendant PIU has also raised a number of counterclaims including breach of contract for failure to offset payments owed to Peglar because of fees received from Prudential, unfair practices under the Texas insurance code, fraud, CUTPA, and unenforceability of illegal contract under Texas law.
Peglar did not have an insurance agent's license in the state of Texas. However, no affirmative promise or representation was ever made by Baumann that he had obtained such a license. Defendants have also submitted insufficient evidence that a license as an insurance agent under Texas law was required for the activities that Baumann was engaged in under the 1991 and 1994 Agreements.
Defendants have also presented no evidence of fraud, misrepresentations, or of any other conduct by Peglar that forms the basis of its Counterclaims sounding in unfair practices, fraud, CUTPA and unenforceability of contract and defendants have therefore not met their burden of proof as to any of these Counterclaims.
With regard to the breach of contract counterclaim, PIU paid all money owed to Peglar on policies produced by PIU through May of 1996 with the exception of the CIGNA business which based on the evidence presented totaled $10,000. Peglar received $66,572 directly from Prudential but failed to give PIU a credit for these monies pursuant to paragraph two of the 1991 Agreement. Paragraph two also provides, however, that the "amount of any such offset shall not exceed the maximum amount of the finders fee received hereunder". Defendant did not present evidence of the amount of the finders' fees received under this agreement and therefore the court cannot determine if the $56,572 credit owed by Peglar exceeds the finders' fees paid to Peglar. Accordingly, PIU has not sustained its burden of proof on the first cause of action and Judgment will enter for the plaintiff on all of the counterclaims.
 ___________________ CHASE T. ROGERS SUPERIOR COURT JUDGE